# EXHIBIT A

R. Shawn Oller, Bar No. 019233
soller@littler.com
Carlos B. Gutierrez, Bar No. 025063
cgutierrez@littler.com
LITTLER MENDELSON, P.C.
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, Arizona 85016
Telephone:   602.474.3600
Facsimile:    602.957.1801

Attorneys for Defendant
Fitness Alliance, LLC d/b/a EoS Fitness

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Wilfredo Cruz, | Case No.  2:24-cv-02926-JJT |
| Plaintiff, | **DECLARATION OF HELENA BERMINGHAM** |
| v. | |
| Fitness Alliance, LLC d/b/a EoS Fitness, | |
| Defendant. | |

I, Helena Bermingham, declare as follows:

1.      I am currently employed at EoS Fitness Intermediate Holdings, LLC d/b/a EoS Fitness as a Chief People Officer. I have been employed by EoS Fitness Intermediate Holdings, LLC since April 21, 2014, and I have held this position since 2021.  Prior to my present position with EoS Fitness Intermediate Holdings, LLC, I held the position of HR Director and Vice President of HR starting in April 2014. EoS Fitness Intermediate Holdings, LLC owns EoS Fitness Opco Holdings, LLC, which owns various entities, including Fitness Alliance, LLC d/b/a EoS Fitness ("EoS"). In my role as Chief People Officer, I work with EoS and am familiar with its business operations. I make this declaration in support of EoS's Motion to Compel Arbitration

LITTLER MENDELSON,
P.C.
Attorneys at Law
Camelback Esplanade
2425 East Camelback
Road
Suite 900
Phoenix, AZ  85016
602.474.3600

2.      In my capacity as described above, I have personal knowledge of certain facts contained in this declaration. To the extent that I do not have personal knowledge of any facts contained in this declaration, those facts were obtained from documents that were made at or near the time of certain acts by, or from information transmitted by, someone with knowledge of those acts and were kept in the course of a regularly conducted activity of EoS's business in accordance with EoS's regular practice of recording and maintaining such documents.

3.      EoS is engaged in the business of the operation of fitness clubs throughout Arizona, California, Nevada, Florida, Texas, and Utah. EoS currently operates 46 clubs in Arizona, 23 clubs in California, 18 clubs in Nevada, 23 clubs in Florida, 37 clubs in Texas, and 15 clubs in Utah where individual customers pay a monthly fee, and/or personal training fees, and/or small group class fees in order to participate in a variety of fitness activities.

4.      Through my positions with EoS Fitness, I am familiar with the application and hiring process, and have access to personnel and other records pertaining to employees of EoS. This process includes recruiting employees through the internet and using the internet to market EoS's services.

5.      In my role as Chief People Officer, my job duties include ensuring that EoS is maintaining and correcting employee documents and data.  I am also familiar with ADP Recruiting Management ("ADP RM"), a third-party system used by EoS to provide certain employment-related electronic documents to applicants and employees, and which tracks when specific employees have reviewed and electronically signed documents. I am also familiar with the record keeping procedures of the company, including through ADP RM, and the portions of Plaintiff Brian Wilfredo Cruz's ("Plaintiff") file maintained within that computer program.

6.      In my role as Chief People Officer, I am also familiar with ADP RM's application system, a third-party vendor through which EoS manages its application and hiring process and maintains certain employment-related documents.

LITTLER MENDELSON,
P.C.
Attorneys at Law
Camelback Esplanade
2425 East Camelback
Road
Suite 900
Phoenix, AZ  85016
602.474.3600

2

7. The books and records maintained by EoS and its Human Resources Department, including through ADP RM, are made at or when said acts, conditions, proceedings, events, and transaction occurred or form the information transmitted by persons responsible for making and maintaining said books and records.

8. When EOS has an open position, it will post that position on its website. EoS applicants typically apply for employment online. Applicants who visit EoS's website are directed to a third-party recruiting website where they can browse available positions. When an applicant finds a position he or she is interested in, that person must enter his or her e-mail address, mailing address, and phone number. To complete the application process, an applicant must also acknowledge that he or she consents to submit the employment application and all related forms, documents, and information electronically, as well as to conduct any matters related to the recruiting, application, background check and/or onboarding process electronically. The first time a candidate elects to electronically sign the application, the system prompts the applicant to provide their full name and provides the following warning:

> "By entering your name, you consent to submit your employment application and all related forms, documents and information electronically. You further consent to conduct any matters related to the recruiting, application, background check and/or onboarding process electronically. Typing your name in the textbox on a form, and clicking on "Accept", constitutes your electronic signature."

Further, if an applicant changes his or her e-mail or contact information, that person must update the company regarding those changes. Withdrawing consent to proceed with the electronic hiring/application process terminates the application process.

9. Once a candidate has applied, management will review his or her application online and decide whether to interview the candidate. If a candidate successfully interviews and is selected for the job, he or she will be verbally offered a position and management will set a tentative start date. Before a candidate is officially hired, he or she must complete the company's onboarding documents.

LITTLER MENDELSON, P.C.
Attorneys at Law
Camelback Esplanade
2425 East Camelback
Road
Suite 900
Phoenix, AZ 85016
602.474.3600

3

10.     When a verbal offer is extended and accepted, management will extend an offer letter to the new hires via ADP RM. At this time, the Hiring Manager will be prompted to confirm the pay rate, position, location, and start date. Once the manager has entered information, the onboarding packet is routed to the candidate through ADP RM and sent to the e-mail address that the candidate provided during the application process. Therefore, only the candidate can access the onboarding documents via their email or through logging back into the ADP RM system. Once a candidate receives the e-mail from EoS through ADP RM, the candidate logs back into the portal using the login credentials they created when they applied and it then takes them to the EoS onboarding documents, hosted by ADP RM.  Candidates then review and choose whether to sign several documents electronically.

11.     By completing this process, it allows the candidate thereafter to simply type their name that was provided during the application process next to each agreement, indicating their intent to be bound by the same. Additionally, once the offer letter is extended, the candidate is prompted to confirm their legal name, date of birth, and social security number. At the conclusion of each agreement within the onboarding packet, which includes an arbitration agreement, the applicant is required to enter his or her legal name to acknowledge and agree to its terms.

12.     On October 29, 2019, Plaintiff applied to work for EoS and EoS extended him a written offer of employment on October 31, 2019, for the position of Fitness Consultant at its club located in Ahwatukee, Arizona. Attached hereto as **Exhibit 1** is a true and correct copy of EoS's written offer of employment to Brian Cruz. This offer of employment is maintained in the normal course of business in Plaintiff's EoS personnel file.

13.     Plaintiff was also sent a link to the onboarding paperwork through ADP RM. The onboarding paperwork included a Mutual Arbitration Policy ("MAP"), which stated it was "governed solely by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*" It further explained that Plaintiff agreed "to submit to final and binding arbitration any and all claims and disputes that are related in any way to [Plaintiff's] employment or the termination of [his] employment with EoS Fitness." Attached hereto as **Exhibit 2** is a true

LITTLER MENDELSON,
P.C.
Attorneys at Law
Camelback Esplanade
2425 East Camelback
Road
Suite 900
Phoenix, AZ  85016
602.474.3600

4

and correct copy of Plaintiff's onboarding paperwork, including the Mutual Arbitration Policy. *See* Exhibit 2, pp. 2-4. This onboarding paperwork is maintained in the normal course of business in Plaintiff's EoS personnel file.

14.    The Mutual Arbitration Policy requires the candidate to enter their full name below it, confirming their intent to be bound by its terms. Here, the conclusion of the Mutual Arbitration Policy, as shown on Exhibit 2, stated: "ELECTRONIC SIGNATURE: Please type your legal name as it is listed below to acknowledge that you have carefully read and understood this agreement and agree to its terms." *See* Exhibit 2, p. 3.

15.    On October 31, 2019, Plaintiff electronically signed and acknowledged the Mutual Arbitration Policy and agreed to its terms by typing in "Brian Cruz" in the space indicated for his signature. *See* Exhibit 2, p. 4.

16.    In addition to the Mutual Arbitration Policy, the onboarding paperwork that was sent to Plaintiff as described above included other agreements for Plaintiff to electronically sign with links provided for Plaintiff to access the full document of each respective agreement, including the following: Commission Structure; EoS Fitness National Handbook; Handbook Supplement Arizona 2019; On-Duty Meal Waiver; Employee Confidentiality, Non-Solicitation, Non-Competition, & Inventions Agreement; Equal Employment Opportunity and Anti-Discrimination Policy; General Appearance, Photographic & Intellectual Property Release Form; Employee Exercise Waiver; Social Media Guidelines; and Biometric Information Privacy Policy. *See* Exhibit 2, pp. 1-2, 4-10.

17.    The foregoing agreements likewise concluded by requesting that Plaintiff provide his electronic signature by typing in his name to acknowledge he understood each agreement, and on October 31, 2019, Plaintiff electronically signed and acknowledged he understood each of these agreement by typing in "Brian Cruz" in the space indicated for his signature. *See* Exhibit 2, pp. 1-2, 6, 8, 10.

18.    I retrieved a copy of Plaintiff's executed Mutual Arbitration Policy and his other onboarding paperwork, as described above, by searching Plaintiff's personnel file. Documents automatically populate into his profile, or I can go into ADP RM and review

LITTLER MENDELSON, P.C.
Attorneys at Law
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

5

the documents. I went into ADP RM and pulled everything with Plaintiff's name and email address to locate the Mutual Arbitration Policy and his other onboarding paperwork.

19.    At the time of Plaintiff's acknowledgement and agreement to the Mutual Arbitration Policy, EoS employees were provided with the option to download all the documents they have completed through ADP RM.

20.    My review of the applicable electronic documents, including documents maintained in the EoS intranet system, leads me to conclude that Plaintiff electronically signed EoS's Mutual Arbitration Policy, in addition to his other onboarding paperwork, as described above. Specifically, the electronic documents indicate that Plaintiff opened the Mutual Arbitration Policy on EoS's electronic system and agreed to be bound by it on October 31, 2019. These conclusions are based on upon my familiarity with EoS's procedures and the software programs, and documents described above.

21.    After Plaintiff executed the Mutual Arbitration Policy and his other onboarding paperwork, he began his employment with EoS as a Fitness Consultant.

22.    Plaintiff's employment with EoS terminated in December 2023.


I declare under penalty of perjury that the foregoing is true and correct.


Dated this ___11___ day of _____April 2025_____

Helena Bermingham

7B75538D695F42F...

_____
Helena Bermingham

LITTLER MENDELSON,
P.C.
Attorneys at Law
Camelback Esplanade
2425 East Camelback
Road
Suite 900
Phoenix, AZ 85016
602.474.3600

# EXHIBIT 1



1 E. Washington, Suite 250
Phoenix, AZ 85004
(602) 777-7026
EÖSFITNESS.COM

October 31, 2019

Brian Cruz
1001 E Playa Del Norte Dr
Tempe, AZ 85281

Dear Brian,

Congratulations!  Fitness Alliance, LLC dba EōS Fitness (collectively referred to herein as the "Company") is pleased to offer you the position of Fitness Consultant. This letter (the "Notice") sets forth the terms and conditions that will govern your employment:

1. **Position:** Fitness Consultant
2. **Location:**  Ahwatukee
3. **Start Date:** October 31, 2019 Note: start date may be adjusted based on completion of new hire paperwork and/or successful completion of background check or proof of certifications for certain positions.
4. **Compensation:** $11.00 per hour; and commission pursuant to the Commission Agreement attached here.
5. **Regular Payday:** EōS Fitness regularly pays wages on a Bi-Weekly schedule with wages paid every other Monday.
6. **Vacation Pay:** Full-time employees working 30+ hours/week shall begin accruing 5-days of paid vacation time after the completion of their 1st year of employment.
7. **Sick Time:** 1 hour of sick accrued for every 30 hours worked.
8. **Benefits:** Full-time employees working 30+ hours/week shall be eligible for medical, dental and vision benefits 60 days following the first of the month. Please see the Company's Benefit Guide for further details here.
9. **Confidentiality:** Standard Confidentiality Agreement to be signed. See full agreement here.
10. **Arbitration:** All arbitrate Claims shall be settled by final and binding arbitration. See full agreement here.
11. Candidate warrants and represents that they have the right to enter into this type of Employment Relationship and shall indemnify the Company from any third party claims to the contrary.


Nothing herein shall be construed to alter the at-will nature of the employment relationship between you and the Company.

Yours in Health,

Manuel Loyden

# EXHIBIT 2

44_AZA_Cruz_1572564823302 - Fitness Consultant
Oct 31, 2019



## Commission Structure

All employees are eligible to earn a commission for Membership, Personal Training and Service sales. The below structure describes the Company's current commission structure.

MEMBERSHIP/SERVICES/ PERSONAL TRAINING/GROUP TRAINING:

Commissions on all sales will be paid each pay period after at least one EFT draft payment is confirmed. A sales report will be run each Wednesday for the corresponding sales to confirm if the Member's first EFT draft payment was received. Once confirmed, commission is earned and commissions on those sales will paid on the following pay date. Please reference the Bi-Weekly Pay Schedule for specific dates. Contracts must be sold under your name. Only commissions on Personal Training are only allowed to be split between two employees if the "Laws of Commission" protocol is followed. Otherwise, reversals and/or "splits" will not be permitted. Additionally, commissions are only paid to the employee if the Member's contract is determined to be in "good" status. Members in a "pending cancel" status is not considered to be in "good" status and is not considered commissionable. "Good" status is defined as having:

1. a legally executed membership agreement with valid signature on contract;
2. a legally executed PT Agreement with valid signature on contract;
3. valid billing information;
4. valid contact, email and demographic information within the Sales system;
5. down payments must be taken in the format of a personal check or major credit card.

Thereafter, all payments must be taken under an EFT or drafted under a major credit card (cash payments are not permissible!).

**Click here** to read the full document.

**ELECTRONIC SIGNATURE: Please type your legal name as it is listed below to acknowledge that you have read and understand this document.**

First Name: Brian
Last Name: Cruz

Signature: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        Brian Cruz

EōS Fitness National Handbook

### EōS Fitness National Handbook

## Welcome to Our Team!

On behalf of the Management, herein referred to as the "Company" or the "Gym", we want to welcome you as a member of our EōS Fitness team. As I'm sure you know by now, you're not just joining a company....you're becoming a part of a new and exciting brand.

Best of all, you will now have an opportunity to positively change people's lives every day you come to work. There is nothing more rewarding than knowing you've helped someone overcome obesity, build confidence, battle diabetes, or simply get in or stay in shape. No matter what your role, you are helping our members achieve these results. We wish you success and sincerely hope you will find a great deal of personal satisfaction in your new position with us.

It is our belief and the belief of our management team that you are one of our most important assets. The growth and success of the Company is determined in large measure by your personal contribution to the organization while you are with us. In support of this belief, all of us give primary consideration to the well-being and concerns of each of our employees. Equally important is the opportunity for everyone to contribute and provide input to obtain a sense of accomplishment and pride in the work done by each person working with us.

This Handbook will give you important information about working for the Company and is intended to outline many of our policies and benefits. It also explains what the Company expects of you and what you can expect of us.

Moreover, this Handbook cannot cover every situation or answer every question that you may have about policies and benefits. Please take the time to read it carefully and feel free to consult with a Manager, any member of management, or the Human Resources department if you have any questions. Moving forward, we welcome your suggestions on ways we can improve policies in the Handbook or our operations in general. You are part of the team and we value your opinion.

From time to time, new policies will need to be written and old ones revised. This Handbook replaces and supersedes all prior handbooks and all other oral statements. With the exception of the at-will policy, the Company reserves the right to make such changes at any time. Any change in the at-will relationship between you and the Company must be in writing and signed by the President. You will be provided with notice of such changes when they are made.

Each employee of the Company is required to sign a receipt and acknowledgment for this Handbook, including any State Supplements. Your signature on that document indicates that you will take the time to read this Handbook and follow all Company rules.

By accepting employment with the Company, it is understood that an employee agrees to comply with Company rules and understands that employment is at-will, which means that both the Company and the employee are free to end employment at any time, for any reason. No manager or supervisor has the authority to alter the at-will policy. Only the President or the President's authorized representative has such authority and then only in writing, signed by the President or the President's authorized representative.

Nothing in this Handbook or in any other document or policy is intended to violate any local, state, or federal law. Nothing in this Handbook or in any other document or policy is intended to limit any concerted activities by employees relating to their wages, hours, or working conditions, or any other conduct protected by Section 7 of the National Labor Relations Act. Furthermore, nothing in this Handbook prohibits an employee from reporting concerns to, filing a charge or complaint with, making lawful disclosures to, providing documents or other information to, or participating in an investigation or hearing conducted by the Equal Employment Opportunity Commission (EEOC), National Labor Relations Board (NLRB), Securities and Exchange Commission (SEC) or any other federal, state, or local agency charged with the enforcement of any laws.

This handbook may apply to employees working in a state with greater or different rights. employees will receive a state-specific supplement to the employee handbook that provides information and policies applicable to employees working in that state. the company complies with applicable state and local laws.

Nothing in this Handbook is intended to change or alter the at-will employment relationship.

**Click here** to read the full document.

**ELECTRONIC SIGNATURE: Please type your legal name as it is listed below to acknowledge that you have read and understand the Company's Handbook.**

**First Name:** Brian
**Last Name:** Cruz

Signature: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Brian Cruz

Handbook Supplement - AZ

Handbook Supplement Arizona 2019

**About This Arizona Supplement**

The Company is committed to workplace policies and practices that comply with federal, state and local laws. For this reason, Arizona employees will receive the Company's national handbook ("National Handbook") and the Arizona Supplement to the National Handbook ("Arizona Supplement") (together, the "Employee Handbook").

The Arizona Supplement applies only to Arizona employees. It is intended as a resource containing specific provisions derived under Arizona law that apply to the employee's employment. It should be read together with the National Handbook and, to the extent that the policies in the Arizona Supplement are different from, or more generous than those in the National Handbook, the policies in the Arizona Supplement will apply.

**Click here** to read the full document.

**ELECTRONIC SIGNATURE: Please type your legal name as it is listed below to acknowledge that you have read and understand the Company's Handbook Supplement.**

**First Name:** Brian
**Last Name:** Cruz

Signature: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Brian Cruz

On-Duty Meal Waiver

On-Duty Meal Waiver

I, _____ understand that due to the nature of the work that I perform in my position and/or due to my schedule on the graveyard shift, that on occasion it may not be possible to relieve me from all duty for the purpose of taking a thirty–minute unpaid meal period. Consequently, I am voluntarily waiving my right to take an unpaid thirty minute off–duty meal period should conditions prevent me from being relieved of all job responsibilities during a meal period. I understand that in lieu of an unpaid meal period, I will instead receive an on–duty meal period, which will count as time worked and be paid at my regular rate of pay, or any applicable overtime rate. I understand this agreement may be voluntarily revoked by me at any time upon submission of a written request to revoke this agreement.

**Click here** to read the full document.

**ELECTRONIC SIGNATURE: Please type your legal name as it is listed below to acknowledge that you have carefully read and understand this agreement and agree to its terms.**

**First Name:** Brian
**Last Name:** Cruz

Signature: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Brian Cruz

Mutual Agreement to Arbitrate Claims

NOTICE TO EMPLOYEES ABOUT OUR MUTUAL ARBITRATION POLICY

EōS Fitness has adopted and implemented a new arbitration policy, requiring mandatory, binding arbitration of disputes, for all employees, regardless of length of service. This memorandum explains the procedures, as well as how the Arbitration Policy works as a whole. Please take the time to read this material. **IT APPLIES TO YOU.** It will govern all existing or future disputes between you and EōS Fitness that are related in any way to your employment.

## Arbitration Policy & Procedures

The Company sincerely hopes that you will never have a dispute relating to your employment here. However, we recognize that disputes sometimes arise between an employer and its employees relating to the employment relationship. We also recognize that not every dispute can be successfully resolved informally. EōS Fitness believes that it is in the best interests of the employees and EōS Fitness to resolve those disputes in a forum that provides the fastest and fairest method for resolving them. Therefore, EōS Fitness has adopted and implemented this Mutual Arbitration Policy ("MAP") as a mandatory condition of employment.

The MAP applies to all EōS Fitness employees, regardless of length of service or status, and covers all disputes relating to or arising out of an employee's employment with EōS Fitness or the termination of that employment. Examples of the type of disputes or claims covered by the MAP include, but are not limited to, claims against employees for fraud, conversion, misappropriation of trade secrets, or claims by employees for wrongful termination of employment, breach of contract, fraud, employment discrimination, harassment or retaliation under the Americans With Disabilities Act, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964 and its amendments, the California Fair Employment and Housing Act or any other state or local anti–discrimination laws, tort claims, wage or overtime claims or other claims under the Labor Code, or any other legal or equitable claims and causes or action recognized by local, state or federal law or regulations. The MAP does <u>not</u> cover workers' compensation claims, unemployment insurance claims or any claims that could be made to the National Labor Relations Board. Because the MAP changes the forum in which you may pursue claims against EōS Fitness and affects your legal rights, you may wish to review the MAP with an attorney or other advisor of your choice. EōS Fitness encourages you to do so.

<u>Your decision to accept employment or to continue employment with EōS Fitness constitutes your agreement to be bound by the MAP.</u> Likewise, EōS Fitness agrees to be bound by the MAP. This mutual obligation to arbitrate claims means that both you and EōS Fitness are bound to use the MAP as the only means of resolving any employment–related disputes. This mutual agreement to arbitrate claims also means that both you and EōS Fitness forego any right either may have to a jury trial on claims relating in any way to your employment including class claims, and both you and EōS Fitness forego and waive any right to join or consolidate claims in arbitration with others or to

make claims in arbitration as a representative or as a member of a class unless such procedures are agreed to by both you and EōS Fitness. No remedies that otherwise would be available to you individually or to EōS Fitness in a court of law, however, will be forfeited by virtue of this agreement to use and be bound by the MAP.

The MAP shall be governed solely by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.* If for any reason the FAA is deemed inapplicable, only then will the applicable state arbitration statutes govern the MAP. The National Rules for the Resolution of Employment Disputes of the American Arbitration Association ("AAA") in place at the time of the dispute will govern the procedures to be used in arbitration, unless you and EōS Fitness agree otherwise in writing. The rules can be found at http://www.adr.org in the section entitled Employment or by request to EōS Fitness in writing.

### Notice To Employees About Our Mutual Arbitration Policy

**What Is Arbitration?**

Arbitration is a process in which a dispute is presented to a neutral third party, the arbitrator, for a final and binding decision. The arbitrator makes this decision after both sides present their evidence and arguments at the arbitration hearing. There is no jury. If you win, you can be awarded anything you might individually have received in a court.

The arbitration process is limited to disputes, claims or controversies that a court of law would be authorized to entertain or would have jurisdiction over to grant relief and that in any way arise out of, relate to or are associated with your employment with EōS Fitness or the termination of your employment. The parties in any such arbitration will be limited to you and EōS Fitness, unless you and EōS Fitness agree otherwise in writing. An impartial and independent arbitrator chosen by agreement of both you and EōS Fitness will be retained to make a final decision on your dispute or claim, based on application of EōS Fitness' policies and procedures and applicable law. The arbitrator's decision is final and binding on you and EōS Fitness.

A neutral party, the American Arbitration Association ("AAA"), runs the proceedings, which are held privately. Since 1926, AAA has handled many thousands of cases. Though arbitration is much less formal than a court trial, it is an orderly proceeding, governed by rules of procedure and legal standards of conduct. The arbitrator's responsibility is to determine whether EōS Fitness' policies and procedures and applicable law have been complied with in the matter submitted for arbitration. The arbitrator shall render a written decision on the matter within 30 days after the arbitration hearing is concluded and post–hearing briefs, if any, are submitted.

EōS Fitness and you will share the cost of the AAA's filing fee and the arbitrator's fees and costs, but your share of such fees and costs shall not exceed an amount equal to your local court civil filing fee. Except as otherwise provided by law, you and EōS Fitness will be responsible for the fees and costs of your own respective legal counsel, if any, and any other expenses and costs, such as costs associated with witnesses or obtaining copies of hearing transcripts.

EōS Fitness has access to legal advice through its outside lawyers. You may consult with a lawyer or any other adviser of your choice. You are not required, however, to hire a lawyer to participate in arbitration.

EōS Fitness will not modify or change the agreement between you and EōS Fitness to use final and binding arbitration to resolve employment–related disputes without notifying you and obtaining your consent to such changes, although specific MAP procedures or AAA Rules may be modified from time to time as required by applicable law. Also, the Arbitrator or a court may sever any part of the MAP procedures that do not comport with the Federal Arbitration Act.

**Conclusion**

If after reading the above summary of EōS Fitness' arbitration policy, you have questions, you should direct them to Human Resources.

EōS Fitness is proud of its strong relationship with its employees, and is confident that most problems, disputes and complaints can be handled either by your immediate supervisor or by a higher level of management. The MAP will compliment these policies, by allowing you and EōS Fitness to resolve any remaining disputes in a quick, private and final manner that benefits all of us.

EMPLOYEE AGREEMENT TO ARBITRATE

I acknowledge that I have received and reviewed a copy of EōS Fitness' Mutual Arbitration Policy ("MAP"), and I understand that it is a condition of my employment and a condition of my continued employment with EōS Fitness. I agree that it is my obligation to make use of the MAP and to submit to final and binding arbitration any and all claims and disputes that are related in any way to my employment or the termination of my employment with EōS Fitness.

I understand that final and binding arbitration will be the sole and exclusive remedy for any such claim or dispute against EōS Fitness or its parent, subsidiary, sister or affiliated companies or entities, and each of its and/or their employees, officers, directors or agents ("the Company") and that, by agreeing to use arbitration to resolve my dispute, both the Company and I agree to forego any right we each may have had to a jury trial on issues covered by the MAP, and forego any right to bring claims on a representative or class basis. I also agree that such arbitration will be conducted before an arbitrator chosen by the Company and me and will be conducted under the Federal Arbitration Act and the applicable procedural rules of the American Arbitration Association ("AAA").

I acknowledge that in exchange for my agreement to arbitrate, the Company also agrees to submit all claims and disputes it may have with me to final and binding arbitration, and the Company further agrees that if I submit a request for binding arbitration, my maximum out–of–pocket expenses for the arbitrator and the administrative costs of the AAA will be an amount equal to the local civil court filing fee and the Company will pay all of the remaining fees and administrative costs of the arbitrator and the AAA. If any provision of the MAP is found unenforceable, that provision may be severed without affecting this agreement to arbitrate. I further acknowledge that this mutual obligation to arbitrate may not be modified or rescinded except by the mutual consent of both the Company and me.

The signed original copy of this agreement must be given to your supervisor and it will be filed in your personnel file; the other copies, and the manual, are for your personal records.

Click here to download a copy.

ELECTRONIC SIGNATURE: Please type your legal name as it is listed below to acknowledge that you have carefully read and understand this agreement and agree to its terms.

**First Name:** Brian
**Last Name:** Cruz

**Signature:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        Brian Cruz

Employee Confidentiality AZ

**EōSFITNESS**
BETTER GYM. BETTER PRICE.

**EMPLOYEE CONFIDENTIALITY, NON-SOLICITATION, NON-COMPETITION, & INVENTIONS AGREEMENT**

In consideration of the undersigned Employee's employment and/or continued employment with Fitness Alliance, LLC (the "Company") and/or any Company Party (as defined below), Employee agrees as follows:

Employee acknowledges that during the course of his/her employment, he/she may be given access to the Company Parties' confidential, proprietary and trade secret information as defined herein ("Confidential Information"). Employee acknowledges that the Company Parties have expended substantial resources to develop and maintain such Confidential Information, including compilations of such Confidential Information, and that the Company Parties are entitled to maintain such Confidential Information as their sole and exclusive property. Employee acknowledges that the Company Parties have taken reasonable steps and made every effort to maintain the secrecy of their Confidential Information, and as such, Employee acknowledges that the Company Parties are entitled to maintain this information as confidential, proprietary and trade secret information. Employee acknowledges that Confidential Information is a valuable asset that has economic value because it is not generally known by the public or others who could use this information to their own economic advantage or to the competitive disadvantage of the Company. Employee agrees he/she will not disclose or use any Confidential Information, either during or after Employee's employment, other than in the course and scope of his/her employment with the Company or a Company Party. Confidential Information about the Company Parties, their clients, employees, suppliers and vendors is to be kept confidential and divulged only to individuals within the Company Parties with a need to receive, and authorized to receive, such information. Employee agrees to take reasonable precautions to prevent unauthorized disclosure of Confidential Information. If in doubt as to whether information should be divulged, Employee agrees that he/she will err in favor of not divulging information and will discuss the situation with the Company's Human Resources or Legal department prior to disclosure. Employee's nondisclosure obligation shall extend for a period of two (2) years after Employee's termination as to Confidential Information that does not qualify for protection as a trade secret. Trade Secret Information shall be protected from disclosure as long as the information at issue continues to qualify as a trade secret.

1. **Confidentiality.** Employee agrees to keep all Confidential Information secret and confidential, and will not (i) except for purposes of carrying out any duties as an employee of the Company or Company Party as authorized or directed by Employee's superiors, use, disclose, disseminate, publish or transfer any Confidential Information to any person, corporation, firm, or other entity, either during Employee's period of employment (the "Employment Period") or for a period of two (2) years after Employee's termination as to Confidential Information that does not qualify for protection as a trade secret. Trade Secret information shall be protected from disclosure as long as the information at issue continues to qualify as a trade secret;

Specifically, Confidential Information includes, but is not limited to:

1. Information, and compilations of information, regarding proprietary business plans, such as innovations, inventions, discoveries, improvements, research or test results and data;
2. Information, and compilations of information, regarding costs, pricing, suppliers, sales, or business affairs of the Company Parties;
3. Information, and compilations of information, regarding or constituting marketing plans, business plans, strategies and forecasts, including plans for existing or future locations;
4. Information, and compilations of information, regarding or constituting projects, financing, concepts, investments, market strategies or tax planning;
5. Information, and compilations of information, regarding or constituting unpublished financial information, including budgets, or projections;
6. Information, and compilations of information, regarding investors, including their identities and contact information, as well as the nature and scope of any investment, investment returns or fees;
7. Information regarding or constituting software developed by the company or modifications thereto, techniques, designs, processes, formulas, developments or experimental work, work in process developed by the Company Parties and/or related to the Company Parties' business operations;
8. Information regarding the Company Parties' unique products and services that are not public;
9. Information, and compilations of information, regarding members, including the identities of specific members, personal contact or other private member information, attendance and spending habits or patterns of members, and member preferences;

The foregoing is meant to be inclusive of all Confidential Information that has actual commercial value or other utility in the business in which Company Parties are engaged or in which it contemplates engaging and where the unauthorized disclosure of such Confidential Information could be detrimental to the interests of Company Parties, whether or not such information is specifically identified as Confidential Information by any Company Party, and including where such Confidential Information would, whether individually or by virtue of the value of its compilation, qualify for protection as a trade secret pursuant to applicable law.

Employee acknowledges that the Company Parties have received and in the future will receive confidential or proprietary information from third parties (including, without limitation, investors, members and potential investors and members) ("Third Party Information") subject to a duty on the Company Parties' part to maintain the confidentiality of such information and to use it for only certain limited purposes. Employee agrees that any such Third Party Information shall be included within the term "Confidential Information" for all purposes under this Agreement. Employee will not use, disclose, publish, disseminate, publicize and/or cause to be used, disclosed, published, disseminated or publicized any such Third Party Information by any means in any manner, for profit or otherwise, to any person or entity, including without limitation, newspapers, periodicals, magazines, publications, television stations, radio stations, publishers, internet, including but not limited to, social networking sites (e.g., Facebook, Instagram and Twitter), mobile phones and other hand held devices, and any other enterprise involved in the print or electronic media, whether now known or later created, including individuals working directly or indirectly for or on behalf of any of said entities, without the express written consent of the Company in each and every case. Such Third Party Information specifically includes information regarding members who are public figures and celebrities, and who seek to enjoy the Company Party's venues in a private and confidential manner.

Confidential Information does not include information that (i) is in or enters the public domain without breach of this Agreement; (ii) is received from a third party explicitly without restriction on disclosure and without breach of a nondisclosure obligation; or (iii) is required to be disclosed by order of a court or other governmental agency; provided that the appropriate Company Party shall first be given reasonable notice and opportunity to obtain a protective order against disclosure of such information. Additionally, Confidential Information does not include information lawfully acquired by a non–management employee about wages, hours or other terms and conditions of employment when used for purposes protected by §7 of the National Labor Relations Act such as joining or forming a union, engaging in collective bargaining, or engaging in other concerted activity for mutual aid or protection of laborers. For purpose of clarity, it shall still be a violation of this Agreement for a non–management employee to wrongfully compete by sharing Confidential Information with a competitor about other employees' compensation and benefits which was obtained through the course of employment with the Company for purposes of assisting such competitor in soliciting Company employees.

Confidential Information may not be removed from any Company Party's premises without express authorization. Employee is not permitted to remove or make copies of any Company Party's records, reports, documents or photographs without prior approval. This includes dissemination by electronic means, including email and instant messaging. Unauthorized disclosure of Confidential Information could lead to termination, as well as other possible legal action. By accepting and continuing employment Employee agrees that he/she will not disclose to any unauthorized person, firm, association, corporation or entity any Confidential Information acquired through Employee's employment.

Nothing in this agreement prohibits Employee from reporting an event that Employee reasonably and in good faith believes is a violation of law to the relevant law–enforcement agency, or from cooperating in an investigation conducted by such a government agency. This may include disclosure of trade secret or confidential information within the limitations permitted by the Defend Trade Secrets Act (DTSA). Employee is notified that under the DTSA, no individual will be held criminally or civilly liable under Federal or State trade secret law for disclosure of a trade secret (as defined in the Economic Espionage Act) that is: (A) made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and made solely for the purpose of reporting or investigating a suspected violation of law; or, (B) made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public. Further, an individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

2. **Protective Covenants.** Employee stipulates that: (a) the protective covenants provided for below are reasonable and necessary to protect legitimate business interests of the Company, and do not impose an unreasonable burden upon Employee or the public; (b) confidentiality obligations standing alone are inadequate to protect the Company's legitimate business interests and to prevent irreparable harm; (c) the Company has relationships with its members that are of a long–term and repeat nature and that take significant Company time, expense, and effort to develop and maintain; and (d) the Company has an interest in a stable workforce and to protect its efforts to recruit and train employees. (a) Definitions. Employee acknowledges and agrees that:

- (i) "Competing Business" means any person, entity, or organization (other than a Company Party) that is engaged in or planning to engage in the operation or selling of a Competing Product or Service.
- (ii) "Competing Product or Service" is any product or service that competes with a product or service of the Company Parties as to which Employee had material–involvement or received

Confidential Information about during the Look Back Period. It is understood and agreed that the Company Parties' products and services include, without limitation: the operation of fitness centers/gyms with best–in–class amenities, pools, and personal training and the latest in cardio and strength training equipment as well as group exercise programs including Zumba, yoga, group cycling, mixed martial arts, muscle endurance training, and Pilates;

- (iii) "Covered Member" means any actual or prospective member of the Company Parties as to whom/which: (A) Employee had contact or dealings with on behalf of the Company Parties; and/or (B) about whom/which Employee had access to Confidential Information, during the Look Back Period.
- (iv) "Look Back Period" means: (i) during employment – the two year period preceding the date at issue or such shorter length of time as Employee has been employed with the Company if Employee has been employed for less than two years as of such date; and, (ii) after employment ends – the two year period preceding the last day of Employee's employment with the Company or such shorter period as Employee was employed with the Company if the Employee was employed for less than two years.
- (v) The "Restricted Area" means and includes the territory or territories or other geographic areas in which the Company Group does business and as to which: Employee performed services on behalf of the Company Group; had managerial, operational, or market–development responsibility on behalf of the Company Group; and/or about which Employee had access to Company Group Confidential Information, during the Look Back Period. It shall be assumed that "Restricted Area" includes the 15–mile radius surrounding: (1) any principal office(s) or gyms to which Employee was assigned or at which Employee was primarily located during the Look Back Period; and (2) each office, gym, or facility of the Company for which Employee had managerial, operational, or market–development responsibility during the Look Back Period.

- (b) <u>Restriction Against Unfair Competition for Employees Who Are Not Above Club Level or Corporate.</u> Employee who did not work at above club level or corporate at any time during the Look Back Period agrees that during Employee's employment and for a period of six (6) months following termination of Employee's employment, Employee will not: (i) work for VASA, within the Restricted Area in circumstances where Employee's duties, services, and/or responsibilities are the same as or substantially similar to any duties and responsibilities Employee performed for the Company during the Look Back Period or that are otherwise likely or probable to result in the use or disclosure of Confidential Information; or (ii) perform for VASA any management, planning, consulting, market development or operational functions or services within the Restricted Area which are the same as or substantially similar to any of the functions and services which Employee performed for the Company during the Look Back Period.

- (c) <u>Restriction Against Unfair Competition for Employees Who Are Above Club Level or Corporate.</u> Employee who worked at Above Club Level or Corporate at any time during the Look Back Period agrees that during Employee's employment and for a period of six (6) months following termination of Employee's employment, Employee will not: (i) work for a Competing Business, within the Restricted Area in circumstances where Employee's duties, services, and/or responsibilities are the same as or substantially similar to any duties and responsibilities Employee performed for the Company during the Look Back Period or that are otherwise likely or probable to result in the use or disclosure of Confidential Information; or (ii) perform for a Competing Business any management, planning, consulting, market development or operational functions or services within the Restricted Area which are the same as or substantially similar to any of the functions and services which Employee performed for the Company during the Look Back Period. Nothing herein prohibits Employee's employment in a separately operated subsidiary or other business unit of a company owned by or affiliated with a Competing Business if such separate business unit: (1) is not, itself, an actual or potential competitor of the Company and (2) if Employee's duties, responsibilities, and/or services do not relate to or involve any Competing Product or Service. In addition, the foregoing shall not be construed to preclude Employee from owning up to one percent (1%) of the outstanding stock of a publicly held corporation that constitutes or is affiliated with a Competing Business.

- (d) <u>Restriction Against Member Interference.</u> Employee agrees that during Employee's employment and for a period of six (6) months following termination of Employee's employment, Employee will not solicit or communicate, directly or indirectly, with a Covered Member for the purpose of (i) selling or providing the Covered Member a Competing Product or Service, or (ii) inducing or encouraging the Covered Member to end, or change to the Company Parties' detriment the member's relationship with the Company Parties.

- (e) <u>Restriction Against Solicitation of Employees and Contractors.</u> In addition to the foregoing restrictions, Employee specifically agrees that, during the course of his/her employment with any Company Party, he/she may obtain confidential information regarding a Company Party or the Company Parties' employees and contractors including confidential information regarding such person's skills and abilities and compensation. Employee acknowledges that this valuable information is not generally available to the Company Parties' competitors. Employee further acknowledges that to allow any subsequent employer or other entity to use such information to recruit any Company Party's employees and/or contractors would allow a competitor an unfair advantage in recruiting employees and/or identifying contractors. Accordingly, Employee agrees that during the Employment Period and for a period of six (6) months thereafter, Employee will not, directly or indirectly, either for himself or for any other person, firm or corporation, solicit or induce any person who is engaged as an employee, contractor or otherwise by any Company Party who Employee knew or worked with during his/her employment with the Company to terminate his/her employment or other engagement.

- (f) <u>No Moonlighting Without Written Permission.</u> Employee agrees that during the period of Employee's employment with the Company, Employee will not also work for or in furtherance of any Competing Business, including but not limited to VASA, or any other business or position where Employee could have a potential conflict of interest with the Company, unless provided with advance written authorization from the Company. This includes taking a position where Employee's duties, services, and/or responsibilities are the same as substantially similar to any duties and responsibilities Employee performs for the Company. This provision does not apply to Group Fitness Instructors.

3. <u>No Conflict.</u> Employee acknowledges that Employee has no other agreements, relationships or commitments to any other person or entity that conflict with Employee's obligations to any Company Party under this Agreement. Employee will not disclose to any Company Party, or use, or induce any Company Party to use, any proprietary information or trade secrets of others. Employee represents and warrants that Employee has returned all property and confidential information belonging to all prior employers.

4. <u>Inventions.</u> Employee agrees that all inventions and discoveries, concepts, designs, ideas, works of authorship, mask works, improvements, data compilations, unique business methods or processes, know–how, methods, computer programs and software, apparatus and formulae, and any notes, records, drawings, and designs related thereto, as well as any treatment, exercise program, or development project (collectively, "Inventions"), whether patentable or copyrightable (or in any way protectable as intellectual property) which are or have been conceived, made or discovered by Employee, solely or in collaboration with others, or which become known to the Employee by means of any undertaking, investigation or experiment arising out of or relating to Employee's responsibilities as an Employee, during the period of employment are the sole and exclusive property of the Company Parties. In addition, any Inventions which constitute copyrightable subject matter shall be considered "works made for hire" as that term is defined in the United States Copyright Act and related case law. Employee further agrees to assign (or cause to be assigned) and does hereby assign to the fullest extent provided by law, to the appropriate Company Party all such Inventions and any copyrights, patents, moral rights, trademarks or other intellectual property rights relating thereto.

Employee agrees to assist the Company, or its designee, at the Company's expense, in every proper way to obtain, secure, maintain, extend and enforce the Employee's rights in the Inventions and any copyrights, patents, moral rights, trademarks or other intellectual property rights relating to the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain, secure, maintain, extend and enforce such rights and in order to assign and convey to the Company, its successors, assigns and nominees the sole and exclusive right, title and interest in and to such Inventions, and any copyrights, patents, moral rights, trademarks or other intellectual property rights relating to such Inventions. Employee further agrees that Employee's obligation to execute or cause to be executed, when it is in Employee's power to do so, any such instrument or papers shall continue after the termination of this Agreement.

Employee agrees that, if the Company is unable because of Employee's unavailability, mental or physical incapacity, or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents or copyright or trademark registrations covering the Inventions assigned to the Company above, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney–in–fact, to act for and in Employee's behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights and trademarks with the same legal force and effect as if executed by Employee.

In the event that Employee, alone or with others, incorporates into his or her work for the Company Party any inventions, copyright eligible works, trade secrets, trademarks or other items of intellectual property that Employee owns or controls and that are not assigned to a Company Party via this Agreement or some prior agreement, then Employee hereby grants the Company an irrevocable, perpetual, fully paid–up, royalty–free, worldwide license to make, use, sell, reproduce, display, modify, or distribute such item and its derivatives in the Company's products and services at Company's discretion and without any obligation to provide attribution, royalties, or other compensation to Employee.

Employee agrees to exhaustively identify and disclose any prior inventions, improvements, developments, concepts, discoveries or other proprietary information owned by Employee or in which Employee has an interest prior to his/her employment by the Company Party on the attached hereto SCHEDULE A "Excluded Prior Inventions." If Employee fails to identify any prior invention or item in SCHEDULE A, attached hereto, Employee agrees that Employee does not own or have any interest in any such prior invention or item.

5. <u>Return on Termination and Computer Authorization.</u> In the event of termination (voluntary or otherwise) of employment with the Company Party or on demand at anytime prior thereto, Employee agrees to deliver promptly to the Company Party all Confidential Information and Inventions of any Company Party, whether prepared by Employee or otherwise coming into his possession or control relating to any product, business, work, member, supplier, or other aspect of any Company Party. This obligation shall include the return of any materials, whether written, electronic or in any other form, including any summaries, copies, excerpts, notes or memoranda containing or relating to any Confidential Information or Inventions. Employee is not authorized to access and use the Company's computers, email, or related computer systems to compete or to prepare to compete, or to otherwise compromise the Company's legitimate

business interests, and unauthorized access to or use of the Company's computers in violation of this understanding may subject Employee to civil and/or criminal liability.

6. **Further Acts.** Employee agrees that, both during his or her employment and at all times thereafter, Employee will sign all papers, give evidence and testimony, and, at the Company's expense, perform all acts which, in the Company's opinion, are necessary, proper or expedient to carry out and fulfill the purposes and intents of this Agreement.

7. **Remedies.** If Employee breaches any of his or her obligations under this Agreement, the Company or any Company Party shall be entitled to any one or more of the following remedies:

- (a) Employee shall be liable to the Company or Company Party for all damages proximately or legally caused as a result of the breach of his or her obligations under this Agreement and may be liable to the Company or Company Party for exemplary and punitive damages where provided by law.
- (b) To the extent permitted by law, Employee shall hold in constructive trust for the benefit of the Company and all Company Parties all proceeds derived through the appropriation, exploitation or use in any manner of Confidential Information or Inventions covered hereunder.
- (c) Employee may be enjoined, by temporary restraining order, preliminary injunction and permanent injunction, without any requirement for the posting of a bond or undertaking, from any appropriation, exploitation or use in any manner of the Confidential Information or Invention In the event that Employee and a Company Party enter into an enforceable Mutual Agreement to Arbitrate Claims, Employee acknowledges and agrees that the Company Party may, as a provisional remedy only, seek injunctive relief from a court of competent jurisdiction to avoid immediate and irreparable injury.

8. **Indemnification.** Employee shall indemnify and hold the Company and all Company Parties harmless from and against all claims incurred or asserted against, and all losses, liabilities, damages, costs and expenses (including reasonable attorneys' and other professionals' fees) incurred, suffered, paid or required to be paid by, the Company or any Company Party to any Third Party resulting, in whole or in part, from any breach of any representation, warranty, covenant or agreement made herein by Employee.

9. **Remedies Cumulative.** Each and all of the several rights and remedies provided for in this Agreement shall be cumulative. No one right or remedy shall be exclusive of the others or of any right or remedy allowed in law or in equity. No waiver or indulgence by the Company or any Company Party of any failure by Employee to keep or perform any promise or condition of this Agreement shall be a waiver of any preceding or succeeding breach of the same or any other promise or condition. No waiver by the Company or any Company Party of any right shall be construed as a waiver of any other right. No Company Party shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

10. **Entire Agreement.** This Agreement contains the entire understanding of the parties regarding the subject matter hereof, and supersedes and replaces all prior writings, understandings and agreements regarding the subject matters contained herein. To the extent that any subject matter contained herein is discussed in any other Company Party document, including the Company Party's Employee Handbook, the provisions of this Agreement shall take precedence. Nothing herein shall impact the enforceability of any provision of the Employee Handbook that is not specifically addressed in this Agreement. No provision of this Agreement shall be amended, modified or waived, except in a writing signed by the party to be bound thereby or by order of a court of competent jurisdiction or a duly–appointed arbitrator. Terms used herein in any number or gender include other numbers or genders, as the context may require.

11. **Company Defined.** For purposes of this Agreement, "Company Parties" collectively and individually, ("Company Party") means Fitness Alliance, LLC and its members, subsidiaries, and affiliates, and each and every other entity which is in control of, controlled by or under common control with the Company or one or more direct or indirect members of the Company or the family members of such members. Any and all such entities and individuals is an intended third–party beneficiary of this Agreement. Should Employee be employed by or transferred to a successor, or to a member, subsidiary, affiliate, or other related entity, this Agreement shall continue in full force and effect as part of the terms of Employee's employment.

12. **Successors and Assigns.** Employee's obligations hereunder shall continue in effect beyond the Employment Period in perpetuity. This Agreement shall be binding upon, and inure to the benefit of, the heirs, executors and administrators of Employee and the successors and assigns of the Company and all Company Parties. Employee specifically agrees that this Agreement may be assigned by the Company and enforced by any assignee or successor of the Company. Employee's rights hereunder are personal and may not be assigned or transferred to any other person, firm, or corporation without the prior, written consent of the Company.

13. **Reformation, Severability, and Survival.** Should any restriction on Employee created by this Agreement be deemed unreasonable or unenforceable as written, then the parties recognize and agree that a court or arbitrator may (where permitted under applicable law) modify any unreasonable or unenforceable element of the restriction to make it reasonable and enforceable or enforce it only to the extent it is reasonable and enforceable; to the maximum amount allowed by law to protect Company's legitimate business interests. The provisions of this Agreement are severable; and if any one or more provisions may be determined to be unenforceable, in whole or in part, despite the power to modify the restriction, the remaining provisions, and any partially unenforceable provisions to the extent enforceable in any jurisdiction, shall nevertheless be binding and enforceable. The existence of a cause of action by Employee against Company shall not constitute a defense to enforcement of the restrictions on Employee contained in this Agreement. This Agreement will be deemed to renew with no reduction in the Company's rights upon Employee's reemployment, promotion, transfer or other material change in status. Nothing in this Agreement shall eliminate, reduce, or otherwise remove any legal duties or obligations that Employee would otherwise have to the Company through common law or statute.

14. **Governing Law and Venue.** This Agreement shall be governed by and construed, interpreted and enforced under the laws of the state in which Employee last regularly worked for the Company. Subject to the terms of any valid and enforceable Mutual Agreement to Arbitrate Claims, an action to enforce this Agreement on a provisional basis must exclusively be brought in a court of competent jurisdiction located in Phoenix, Arizona. Employee waives any other venue to which Employee might be entitled by domicile or otherwise. Employee stipulates and consents to personal jurisdiction in the state and federal courts within Phoenix, Arizona, and waives the right to object to such court's jurisdiction.

15. **At-Will Employment.** Unless otherwise expressly agreed in a written agreement between the parties, Employee acknowledges that Employee is an "at–will" employee and Employee's employment can be terminated, with or without cause, at the option of the Company Party or Employee at any time. Nothing contained in this Agreement shall limit or otherwise alter the foregoing and nothing herein shall be construed as any assurance, promise, or guarantee of employment or continued employment of Employee.

EMPLOYEE HAS READ THIS AGREEMENT CAREFULLY AND UNDERSTANDS ITS TERMS.

October 31, 2019
Date

Brian  Cruz
Print – Name

**Employee Signature** .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Brian Cruz

SCHEDULE A
**Excluded Prior Inventions**

The following is an exhaustive list of all inventions, improvements, developments, concepts, discoveries or other proprietary information in which Employee has an interest prior to Employee's employment with the Company Party:

1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Equal Employment Opportunity and Anti-Discrimination Policy

**Equal Employment Opportunity and Anti-Discrimination Policy**

The Company is committed to providing a work environment that is free of discrimination. In keeping with this commitment, we maintain a strict policy prohibiting unlawful harassment, including sexual harassment. state and/or federal law and the Company's policies strictly prohibit harassment or discrimination based on the following legally protected characteristics: race, color, creed, religion (including religious dress or grooming), national

origin, ancestry, age, physical or mental disability, genetic information (including characteristics and testing), sex, veteran or uniformed service member status, pregnancy (including childbirth, lactation and related medical conditions) or any other consideration made unlawful by federal, state or local laws. The Company will not tolerate such harassment. This policy applies to all employer agents and employees. It also applies to supervisors and management.

Harassment is defined as any unwelcome verbal or physical conduct based on an employee's personal characteristics, as set forth above when:

- Submission to the harassment is made either explicitly or implicitly a term or condition of employment;
- Submission to or rejection of the harassment is used as a basis for employment decisions affecting an individual;
- The harassment has the purpose or effect of interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Sexual Harassment is not tolerated and includes, but is not limited to:

1. Unwanted sexual advances;
2. Offering employment benefits in exchange for sexual favor;
3. Making or threatening reprisals after a negative response to sexual advances;
4. Visual conduct: leering, making sexual gestures, displaying sexually suggestive objects or pictures, cartoons, posters or graffiti, text messages, websites or emails;
5. Verbal conduct: making or using derogatory comments, epithets, slurs, sexually explicit jokes, comments about an employee's body or dress;
6. Verbal sexual advances or propositions;
7. Verbal abuse of a sexual nature, graphic verbal commentary about an individual's body, sexually degrading words to describe an individual, suggestive or obscene letters, notes or invitations;
8. Physical conduct: knowingly unwelcome touching, assault, impeding or blocking movements; and
9. Retaliation for making harassment reports or threatening to report harassment.

This policy applies to harassment by individuals of the same or opposite sex. This policy also protects employees from harassment by vendors, clients/customers or other third parties not employed by the Company. If harassment occurs on the job by someone not employed by the Company, the procedures in this policy should be followed.

Other types of discrimination include, but are not limited to:

Discrimination on the basis of the following legally protected characteristics: race, color, creed, religion (including religious dress or grooming), national origin, ancestry, age, physical or mental disability, genetic information (including characteristics and testing), sex, veteran or uniformed service member status, pregnancy (including childbirth, lactation and related medical conditions) or any other consideration made unlawful by federal, state or local laws. Examples of prohibited harassment include, but are not limited to:

1. Verbal conduct including threats, epithets, derogatory comments or slurs;
2. Visual conduct including derogatory posters, photography, cartoons, drawings, text messages, emails, websites, gestures or graffiti;
3. Physical conduct including assault, unwanted touching or blocking normal movement; and
4. Retaliation for making harassment reports or threatening to report harassment.

Any employee who believes he or she has been subjected to sexual, racial or other harassment/discrimination by a co-worker, supervisor, customer or vendor should bring the matter to the attention of the Human Resources department and his or her manager. Any non–employee who subjects an employee to any harassment in the workplace will be informed of the non–harassment policy; in some circumstances, as appropriate, other action may be taken.

All complaints of harassment will be investigated fully and fairly and remedied. If the investigation reveals that harassment took place, appropriate disciplinary action up to and including termination will be taken.

The Company will not retaliate against an employee for submitting a complaint, or providing evidence as a witness to a complaint, and will not permit retaliation by any person.

It is the responsibility of all members of management, from officers to department managers and supervisors, to create an atmosphere free from harassment. In addition, it is the responsibility of all employees to comply with this policy.

**Hotline**

If you believe you or any other employee has been discriminated against, unlawfully harassed or are the subject of sexual harassment or discrimination by a co–worker or any other employee, Club Manager or any agent, you should report all the facts of the incident and the names of the individuals involved to the Company's management, including the Vice President of Operations, any Above Club Manager or to the Director of Human Resources. Alternatively, **you may call the Hotline at 1-800-97-STOP-IT (1-800 977-8674) and provide the following ID#: 97023.** The Hotline is available 24 hours a day, seven days a week.

The Hotline is a third–party complaint tool that allows you to answer specific questions to identify discrimination, harassment or retaliation. It will also take complaints about theft and safety concerns. This Hotline is not anonymous.

If, for any reason, you are **unable to contact the Hotline,** email the Human Resource department at hr@eosfitness.com. As soon as management receives the report, an investigation and appropriate corrective action will be taken where necessary.

Any employee who, after an investigation, is believed to be responsible for any act of harassment including sexual harassment or discrimination based on another employee's race, color, creed, religion (including religious dress or grooming), national origin, ancestry, age, physical or mental disability, genetic information (including characteristics and testing), sex, veteran or uniformed service member status, pregnancy (including childbirth, lactation and related medical conditions) or any other consideration made unlawful by federal, state or local laws will be subject to disciplinary action of such severity that will stop such harassment or discrimination. This may include separation from employment. Various state agencies and the EEOC review complaints of unlawful discrimination, harassment and retaliation. If you feel you have been subjected to discrimination, harassment or retaliation, you may contact the Department of Fair Employment and Housing, consult the local telephone directory under State Government Offices or ask directory assistance for the number of the Department of Fair Employment and Housing headquarters in Sacramento.

**Retaliation**

No retaliatory action will be taken against anyone who exercises his or her rights to report unlawful harassment, including sexual harassment or discrimination.

**ELECTRONIC SIGNATURE: Please type your legal name as it is listed below to acknowledge that you have read and understand this document.**

First Name: Brian
Last Name: Cruz

Signature: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Brian Cruz
General Appearance, Photographic & Intellectual Property Release Form

General Appearance, Photographic & Intellectual Property Release Form

THIS IS A LEGAL DOCUMENT AFFECTING YOUR RIGHTS AND RESPONSIBILITIES PLEASE READ IT CAREFULLY BEFORE SIGNING.

1. I hereby grant to Fitness Alliance, LLC dba EōS Fitness, and its affiliates, licensees, successors and assignees (hereinafter collectively "EōS") the right to take motion and still pictures of me and record my voice and any sounds made by me, and to obtain other information or materials from or about me, including but not limited to my name, likeness, photograph, voice, dialogue, sounds, biographical information, testimonials, personal characteristics and other personal identification (collectively, the "Footage and Materials"), and to use the Footage and Materials in any manner that EōS, in good faith, sees fit, including but not limited to advertisements, brochures, commercials, publicity and promotions (collectively, the "Advertisements"). The Footage and Materials and the Advertisements may be exploited throughout the universe at any time, in perpetuity, in any and all media now known and hereafter devised, without any compensation to me whatsoever. The rights granted herein shall also include the right to edit, delete, dub and fictionalize the Footage and Materials and the Advertisements as EōS sees fit in EōS's sole discretion. I understand that in no event am I entitled to compensation for the use of the Footage and Materials, including but not limited to any Royalties.

2. EōS has no obligation to me whatsoever. I agree that no material need be submitted to me for approval, and I further agree that EōS may make textual and photographic changes without obtaining additional consent. Without in any way limiting the foregoing, I acknowledge and agree that EōS is under no obligation to use the Footage and Materials.

3. I also understand and agree that EōS has requested that I submit proposed trademarks, slogans, catch phrases, pictures, and/or other works ("Materials") for EōS's consideration for potential use in advertising campaigns, in advertising and marketing materials, and/or on products. I represent that the Materials I submit will be original works and will indemnify EōS in the event that there is any claim that the use of the Materials by EōS violates the rights of any third parties. I agree that in providing the Materials I am transferring all right and interest, including all intellectual property rights, to EōS, and understand that I will not be entitled to any compensation for same. I further agree that in the event it is subsequently determined by a court of competent jurisdiction that notwithstanding the foregoing language, I retain any right, title, or interest in or to the submitted materials, I irrevocably agrees to sell, transfer, and assign any and all such right, title, or interest to EōS, immediately upon EōS's request, for the sum of One Dollar ($1).

ELECTRONIC SIGNATURE: Please type your legal name as it is listed below to acknowledge that you have read and understand this document.

First Name: Brian
Last Name: Cruz

Signature: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Brian Cruz
Employee Exercise Waiver

Employee Exercise Waiver

As an employee of the Company, I acknowledge that I fully understand the rules and regulations that apply to all of the gym facilities. By my signature below, I acknowledge that I am allowed the use of the gym and its facilities when I am not on duty at no cost to me. This is considered to be a conditional benefit of my employment while working for the Company. I understand that I am fully responsible for any damage or damages that I may cause while using such facilities. In addition, I understand and agree to the following:

In attending the Company Gym ("Gym"), and using its facilities and equipment, I agree that I am doing so at my own risk and that I am eighteen (18) years of age or older and I can legally assume that risk. The Gym shall not be liable for any damages arising from personal injuries sustained by me on the premises of the Gym during non–work hours while I am using the facilities. I assume full responsibility for any injuries, which may occur to me on the premises of the Gym, and I hereby release and hold harmless the Gym and its owners, employees and agents from any and all claims resulting from my personal, nonwork–related use of the facilities and equipment of the Gym. I represent that I am in good physical condition and that I have no disability or impairment preventing me from engaging in active or passive exercise or that would be detrimental to my health, safety, or physical condition whatsoever if I do so engage or participate.

I further agree that I am solely responsible for the safety and protection of my personal property while I am on the premises of the Gym, and that the Company shall have no duty or liability whatsoever regarding the protection of my personal property. I further agree to be bound by all of the rules and regulations applying to the use of the gym facilities at any time that I am on the premises

Click here to read the full document.

ELECTRONIC SIGNATURE: Please type your legal name as it is listed below to acknowledge that you have read and understand this document.

First Name: Brian
Last Name: Cruz

Signature: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Brian Cruz
Social Media Guidelines

Social Media Guidelines

The Company respects the rights of its employees to use blogs and other social media tools during their time outside of work. However, it is important for employees to understand that when they engage in online conversations that reference the Company or identify them as a Company employee, the Company's legitimate business interests can be affected, and the Company is at risk of being held responsible for their behavior.

These Social Media Guidelines describe the Company's expectations when employees engage in personal online activity that refer to the Company. If you have any questions about how the Guidelines apply to your online activity, your manager and Human Resources are here to help you.

Click here to read the full document.

ELECTRONIC SIGNATURE: Please type your legal name as it is listed below to acknowledge that you have read and understand this document.

First Name: Brian
Last Name: Cruz

Signature: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Brian Cruz
Biometric Policy

Biometric Information Privacy Policy

The Company has instituted the following biometric information privacy policy:

**Biometric Data Defined**
"Biometric identifier" means a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry. Biometric identifiers do not include writing samples, written signatures, photographs, human biological samples used for valid scientific testing or screening, demographic data, tattoo descriptions, or physical descriptions such as height, weight, hair color, or eye color. Biometric identifiers do not include information captured from a patient in a health care setting or information collected, used, or stored for health care treatment, payment, or operations under the federal Health Insurance Portability and Accountability Act of 1996.

"Biometric information" means any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual. Biometric information does not include information derived from items or procedures excluded under the definition of biometric identifiers.

**Purpose for Collection of Biometric Data**
The Company, its vendors, and/or the licensor of the Company's time and attendance software collect, store, and use biometric data solely for employee identification, fraud prevention, and pre-employment hiring purposes.

**Disclosure and Authorization**
To the extent that the Company, its vendors, and/or the licensor of the Company's time and attendance software collect, capture, or otherwise obtain biometric data relating to an employee, the Company must first:

a. Inform the employee in writing that the Company, its vendors, and/or the licensor of the Company's time and attendance software are collecting, capturing, or otherwise obtaining the employee's biometric data, and that the Company is providing such biometric data to its vendors and the licensor of the Company's time and attendance software;
b. Inform the employee in writing of the specific purpose and length of time for which the employee's biometric data is being collected, stored, and used; and
c. Receive a written release signed by the employee (or his or her legally authorized representative) authorizing the Company, its vendors, and/or the licensor of the Company's time and attendance software to collect, store, and use the employee's biometric data for the specific purposes disclosed by the Company, and for the Company to provide such biometric data to its vendors and the licensor of the Company's time and attendance software.

The Company, its vendors, and/or the licensor of the Company's time and attendance software will not sell, lease, trade, or otherwise profit from employees' biometric data; provided, however, that the Company's vendors and the licensor of the Company's time and attendance software may be paid for products or services used by the Company that utilize such biometric data.

**Disclosure**
The Company will not disclose or disseminate any biometric data to anyone other than its vendors and the licensor of the Company's time and attendance software providing products and services using biometric data without/unless:

a. First obtaining written employee consent to such disclosure or dissemination;
b. The disclosed data completes a financial transaction requested or authorized by the employee;
c. Disclosure is required by state or federal law or municipal ordinance; or
d. Disclosure is required pursuant to a valid warrant or subpoena issued by a court of competent jurisdiction.

**Retention Schedule**
The Company shall retain employee biometric data only until, and shall request that its vendors and the licensor of the Company's time and attendance software permanently destroy such data when, the first of the following occurs:

– The initial purpose for collecting or obtaining such biometric data has been satisfied, such as the termination of the employee's employment with the Company, or the employee moves to a role within the Company for which the biometric data is not used; or
– Within 3 years of the employee's last interaction with the Company.

**Data Storage**
The Company shall use a reasonable standard of care to store, transmit and protect from disclosure any paper or electronic biometric data collected. Such storage, transmission, and protection from disclosure shall be performed in a manner that is the same as or more protective than the manner in which the Company stores, transmits and protects from disclosure other confidential and sensitive information, including personal information that can be used to uniquely identify an individual or an individual's account or property, such as genetic markers, genetic testing information, account numbers, PINs, driver's license numbers and social security numbers.

The employee named below has been advised and understands that the Company, its vendors, and/or the licensor of the Company's time and attendance software collect, retain, and use biometric data for the purpose of identifying employees and recording time entries when utilizing the Company's biometric timeclocks or timeclock attachments. Biometric timeclocks are computer-based systems that scan an employee's finger for purposes of identification. The system does not store a copy a copy of your fingerprint. The computer system extracts unique data points and creates a unique identifier used to verify the employee's identity, for example, when the employee arrives at or departs from the workplace. The unique identifier cannot be used to recreate your fingerprint.

The employee understands that he or she is free to decline to provide biometric identifiers and biometric information to the Company, its vendors, and/or the licensor of the Company's time and attendance software without any adverse employment action. The employee may revoke this consent at any time by notifying the Company in writing.

The undersigned employee acknowledges that he/she has received the attached Biometric Information Privacy Policy, and that he/she voluntarily consents to the Company's, its vendors', and/or the licensor of the Company's time and attendance software's collection, storage, and use of biometric data through a biometric timeclock, including to the extent that it utilizes the employee's biometric identifiers or biometric information as defined in BIPA, and voluntarily consents to the Company providing such biometric data to its vendors, and/or the licensor of the Company's time and attendance software.

**ELECTRONIC SIGNATURE: Please type your legal name as it is listed below to acknowledge that you have read and understand this document.**

**First Name:** Brian
**Last Name:** Cruz

Signature: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        Brian Cruz
eSignature

Electronic Signature

**Please select the <u>Save and Continue</u> at the bottom of the page to move forward and complete your forms.**

I acknowledge that I have read and understand the following policies and documents:
1. Commission Structure
2. UP Coach Compensation Structure
3. E6S Fitness National Handbook
4. E6S Handbook Supplement
5. Equal Employment Opportunity and Anti–Discrimination Policy
6. Mutual Agreement to Arbitrate Claims
7. Employee Confidentiality & Inventions Agreement
8. On–Duty Meal Waiver (optional)
9. Employee Exercise Waiver
10. General Appearance, Photographic & Intellectual Property Release Form
11. Social Media Guidelines

ELECTRONIC SIGNATURE: Please type your legal name as it is listed below:

First Name: Brian
Last Name: Cruz

**E-Signature**

..............................................    Brian Cruz
Accepted